**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| ROBERT WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:24-cv-2227 |
| v. | ) | |
| | ) | |
| GOLDEN NORTH VAN LINES, INC. & | ) | |
| SERENA KRAFT | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

**ORDER DENYING MOTION TO DISMISS**

---

Before the Court is Defendants Golden North Van Lines, Inc.'s ("Golden North's") and Serena Kraft's ("Kraft's") (collectively, "Defendants") Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim, filed on May 9, 2024. (ECF No. 12.) Because Plaintiff Robert Watson ("Watson" or "Plaintiff") has met his prima facie burden to establish personal jurisdiction over Defendants and because common interest privilege does not apply to the communications at issue, the Motion to Dismiss is **DENIED**.

## I. BACKGROUND

### A. Complaint, Removal, and Subject Matter Jurisdiction

Plaintiff filed his Complaint against Defendants in Tennessee state court on March 7, 2024. (ECF No. 1 at PageID 1.) The Complaint contains allegations of defamation as to Kraft, tortious interference as to Kraft, and respondeat superior liability as to Golden North. (Id. at

PageID 2.)  Defendants removed the action to federal court on April 11, 2024.  (Id.)  The Court

has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332.  (Id. at PageID 2.)

### B.  The Parties and RMW

Plaintiff is a citizen of Kentucky. (ECF No. 1-1 at PageID 9.)  For many years prior to

2023, he lived and worked in Memphis, Tennessee.  (Id.)

Golden North is a corporation organized under the laws of the State of Alaska with its

principal place of business in Alaska.  (ECF No. 1 at PageID 2.)  Kraft is a citizen and resident of

Alaska.  (Id.)  Golden North is owned by the Golden North Revocable Trust (75.19%) and by the

Serena J. Kraft Living Trust (24.81%).  (ECF No. 1-1 at PageID 9.)  Kraft is the trustee of the

Serena J. Kraft Living Trust, and serves as the secretary and as a director of Golden North.  (Id.)

For over two decades, Plaintiff was an officer and minority shareholder of Relocation

Management Worldwide, Inc. ("RMW").  (Id. at PageID 8.)  Defendant Golden North and RMW

"did business together for a number of years[,] with RMW managing moves and Golden North

providing the actual moving services."  (ECF No. 1-1 at PageID 10.)

In late 2022, Golden North and RMW began experiencing issues regarding RMW's

ability to pay Golden North.  (Id.)  In February 2023, Plaintiff and a representative of Golden

North began discussions on "either becoming an investor in RMW or potentially buying RMW."

(Id. at PageID 11.)  On or about March 1, 2023, Golden North and RMW signed a non-

disclosure agreement through which Golden North gained access to RMW's "financial and other

business information."  (Id.)  "Throughout March 2023, Golden North had Kraft review and vet

the RMW information to determine whether Golden North wanted to invest in or purchase

RMW."  (Id.)

### C. The Alleged Defamation and Aftermath

Between March 8 and 13, 2024, Kraft sent a series of text messages to Todd Watson, the largest shareholder of RMW.  (Id. at PageID 1, 12.)  Plaintiff alleges these texts discuss Plaintiff "allegedly engaging in criminal behavior towards RMW," and led to his termination.  (Id. at PageID 12, 13.)  The allegedly defamatory texts are reproduced below:

| From | To | Substance |
|------|-----|-----------|
| Kraft | Todd Watson | "I'll tell you right now, Al (Watson) is syphoning money from RMW. I think it's considerable. I just need to prove it which is taking time. Best thing you could do, immediately is lock Al (Watson) out ASAP. These are conversations I don't want to have with RMW staff. This isn't a matter of just cutting expenses. Trust me on this. Would it be possible, or would you have the power to call Frontier Bank and ask them for any and all accounts Al is associated with? Todd this is gonna take more time to see just how big of a problem you have and it's definitely not operational."  (Id. at PageID 12.) |
| Kraft | Todd Watson | "I'm waiting for more data from Rob. He is key in figuring out 50% of the syphoning. The other 50% is back door into an LLC. I'm guessing it's possibly a mill or more a year just on the LLC."  (Id. at PageID 12.) |
| Todd Watson | Kraft | "if that is the case, I will prosecute . . ."  (Id. at PageID 12.) |
| Kraft | Todd Watson | "110 Al is stealing. I have zero doubt in that. But it's on several levels. And Al would deny it to his death, so confronting him would be worthless."  (Id. at PageID 12.) |
| Todd Watson | Kraft | "Well if it was stolen we may have some coverage there ... from insurance. And we have sent people to jail that have taken from the company."  (Id. at PageID 12.) |
| Kraft | Todd Watson | "Criminals, especially long term employees or family are brazen. They are entitled."  (Id. at PageID 13.) |
| Kraft | Todd Watson | "Sorry it's happening. It was likely happening on a low level when Bob was there but when Bob checked out three years ago, I think Al took it to another level."  (Id. at PageID 13.) |
| Todd Watson | Kraft | "[is] Al Watson . . . 'incompetent, negligent or just stupid[?]'"[1]  (Id. at PageID 13.) |
| Kraft | Todd Watson | "It's none of those. That's why he has no sense of urgency here, no concern. He's set. And 98.9% of all employees that embezzle are |

---

[1] Only the interior quotes are from a text message; the full text of that portion of the Complaint states that "Todd Watson texted back to Serena Kraft asking if Al Watson was 'incompetent, negligent or just stupid ....'" (ECF No. 1-1 at PageID 13.)

| | | family or very long term employees [. . .] the ones you trust the most." (Id. at PageID 13.) |
|---|---|---|

After exchanging the above texts, Kraft "traveled to Memphis for the purpose of doing additional due diligence on RMW for Golden North." (Id.) "During her visit to Memphis in late March 2023, Kraft met with Todd Watson and others affiliated with RMW." (Id.) On March 30, 2023, RMW terminated Plaintiff and has subsequently sued him, mirroring the claims made by Kraft in her texts. (Id.) To date, Plaintiff "has not been criminally charged by any law enforcement agency." (Id. at PageID 14.)

### D. Procedural Posture

Defendants filed their Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim, and accompanying Memorandum, on May 9, 2024. (ECF No. 12.) Plaintiff filed his Memorandum in Opposition on May 22, 2024. (ECF No. 17.) Defendants filed their Reply in Support on June 5, 2024. (ECF No. 19.)

## II. LEGAL STANDARD

### A. Personal Jurisdiction

Plaintiff bears "the burden of establishing that a district court can exercise jurisdiction over the defendant." MAG IAS Holdings, Inc. v. Schmuckle, 854 F.3d 894, 899 (6th Cir. 2017). Where the Court rules without an evidentiary hearing, that burden is "relatively slight." Id. (citing Air Prods. & Controls, Inc. v. Safetech Int'l, Inc., 503 F.3d 544, 549 (6th Cir. 2007)). "To defeat dismissal in this context, plaintiffs need make only a prima facie showing that personal jurisdiction exists." Id.

"In determining whether limited personal jurisdiction exists over a given defendant, [the Court] look[s] to both the long-arm statute of the forum state and constitutional due-process requirements." Id. "Tennessee's long-arm statute extends to the limits of due process." Bulso v.

4

O'Shea, 730 F. App'x 347, 349 (6th Cir. 2018) (citing Tenn. Code Ann. § 20-2-214(a)(6)). Thus, the Court looks only to due process requirements. See id.

"Due process requires that a defendant have 'minimum contacts [. . .] with the forum State [. . .] such that he should reasonably anticipate being haled into court there.'" Schneider v. Hardesty, 669 F.3d 693, 701 (6th Cir. 2012) (quoting World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 297 (1980)). The presence of such contacts ensures that the exercise of jurisdiction over the defendant "does not offend 'traditional notions of fair play and substantial justice.'" Id. (quoting Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945)).

"There are two forms of personal jurisdiction: general and specific." Id. Because "Plaintiff does not assert that there is general personal jurisdiction over [Defendants,]" (ECF No. 17 at PageID 85), the Court only looks to specific jurisdiction. See Schneider, 669 F.3d at 701.

"Specific jurisdiction 'depends on an affiliatio[n] between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" Id. (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S.Ct. 2846, 2851 (2011)) (brackets in original). "To conclude that the exercise of [specific personal] jurisdiction is proper, [the Court] must find: (1) purposeful availment 'of the privilege of acting in the forum state or causing a consequence in the forum state,' (2) a 'cause of action [. . .] aris[ing] from activities' in the state, and (3) a 'substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.'" Id. (quoting S. Mach. Co. v. Mohasco Indus., Inc., 401 F.2d 374, 381 (6th Cir. 1968)).

**B. Failure to State a Claim**

Federal Rule of Civil Procedure 12(b)(6) allows dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." It permits the "defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993) (citing Nishiyama v. Dickson Cnty., 814 F.2d 277, 279 (6th Cir. 1987)). A motion to dismiss allows the court to dismiss meritless cases which would waste judicial resources and result in unnecessary discovery. Brown v. City of Memphis, 440 F. Supp. 2d 868, 872 (W.D. Tenn. 2006).

When evaluating a 12(b)(6) motion, the Court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A complaint need not contain detailed factual allegations. Twombly, 550 U.S. at 570. A plaintiff without facts who is "armed with nothing more than conclusions," however, cannot "unlock the doors of discovery." Iqbal, 556 U.S. at 678-79; Green v. Mut. of Omaha Ins. Co., No. 10-2487, 2011 WL 112735, at *3 (W.D. Tenn. Jan. 13, 2011), aff'd, 481 F. App'x 252 (6th Cir. 2012). A court "need not accept as true legal conclusions or unwarranted factual inferences." Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Iqbal, 556 U.S. at 679.

If a court decides that the claim is not plausible, the case may be dismissed at the pleading stage.  Iqbal, 556 U.S. at 679.  "[A] formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.

### C. Defamation, Common Interest Privilege, and Actual Malice

"To make a claim for defamation, Plaintiff must show that '(1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.'"  DSG Com. Eco Cleaning Sys., Inc. v. DHL Express (USA), Inc., No. 2:23-CV-02093-MSN-TMP, 2024 WL 532329, at *3 (W.D. Tenn. Feb. 9, 2024) (quoting Davis v. Tennessean, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001)); see also Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999).  "Publication is a term of art meaning the communication of defamatory matter to a third person."  Sullivan, 995 S.W.2d at 571–72 (cleaned up).

"Tennessee courts have recognized a common interest privilege as one type of conditional privilege."  McGuffey v. Belmont Weekday Sch., No. M201901413COAR3CV, 2020 WL 2754896, at *15 (Tenn. Ct. App. May 27, 2020).  Common interest privilege "extends to all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty."  Bohler v. City of Fairview, No. 3:17-CV-1373, 2018 WL 5786234, at *15 (M.D. Tenn. Nov. 5, 2018) (citing Certain v. Goodwin, No. M2016-00889-COA-R3-CV, 2017 WL 5515863, at *7 (Tenn. Ct. App. Nov. 17, 2017)).  Further, "the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation . . .."  Id.  "It is grounded in public policy as well as reason," as it "is

7

necessary in order that full and unrestricted communication concerning a matter in which the parties have an interest may be had." Id.

If common interest privilege applies, then the "plaintiff has the burden of proving the defendant acted with actual malice." Bernard v. Sumner Reg'l Health Sys., Inc., No. M2000-01478-COA-R3CV, 2002 WL 459006, at *5 (Tenn. Ct. App. Mar. 26, 2002). "In order to prove actual malice, there must be evidence showing that [the] defendant contemplated serious doubts as to the truth of his [or her] statements and that the statements were made with reckless disregard for the truth." Id.

## III. ANALYSIS

### A. Personal Jurisdiction

Defendants contend that Plaintiff has not met his burden in establishing personal jurisdiction. (ECF No. 12-1 at PageID 62.) Defendants assert that Kraft traveling to Memphis, directing her texts to Todd Watson in Tennessee, and signing the NDA are not enough to satisfy the minimum contacts requirement of specific personal jurisdiction. (Id. at PageID 63–65.) Defendants then argue that even if Defendants have sufficient minimum contacts with Tennessee, asserting specific personal jurisdiction would be "unreasonable and unfair." (Id. at PageID 65.)

Plaintiff contests this, stating that the Court has personal jurisdiction over Defendants because Defendants "directed their actions" towards Tennessee by conducting their due diligence over RMW, that the causes of action arose from Defendants' contacts with Tennessee in the process of that due diligence, and that exercise of personal jurisdiction is reasonable. (ECF No. 17 at PageID 87, 89–91.)

The Court addresses each parties' arguments, guided by the three elements of the Mohasco test: (1) purposeful availment; (2) cause of action arising from activities in the state; and (3) reasonableness.  See 401 F.2d at 381.

       *i.  Purposeful availment*

 "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'"  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (internal citations omitted).  Purposeful availment exists when a "defendant create[s] a 'substantial connection' with the forum state by engaging in 'significant activities within [the] State,' or by creating 'continuing obligations' to residents in that state."  Schmuckle, 854 F.3d at 900 (quoting Burger King, 471 U.S. at 475–76).  This includes "business relationships 'intended to be ongoing in nature.'"  Id. (citing CompuServe, Inc. v. Patterson, 89 F.3d 1257, 1265 (6th Cir. 1996)).  In determining whether there is an ongoing business relationship for purposeful availment, the Court looks to "the quality, not the quantity, of a defendant's contacts with the forum state."  Id. at 901 (cleaned up).

Plaintiff has shown Defendants purposefully availed themselves of Tennessee law under prong one of the Mohasco test, satisfying his prima facie burden.  See Schmuckle, 854 F.3d at 899.  Based on Defendants' contact with RMW, Defendants apparently intended to create an "ongoing business relationship" with RMW.  See id. at 900.  Defendants were conducting due diligence in determining whether to invest in or purchase RMW.  (ECF No. 1-1 at PageID 11.)  While Defendants had access to RMW's financial information, Kraft sent the allegedly defamatory texts to Todd Watson.  (Id. at PageID 11–12.)  After Kraft sent the allegedly defamatory texts, she traveled to Memphis to conduct additional due diligence on RMW,

meeting with Todd Watson during her visit.  (Id. at PageID 13.)  This action did not occur just because Plaintiff happened to be in Tennessee; rather, it occurred because "[Defendants] sought[] to further [their] business and create 'continuous and substantial' consequences there." See Calphalon Corp. v. Rowlette, 228 F.3d 718, 723 (6th Cir. 2000).  Defendants' contacts were not "the type of 'random,' 'fortuitous,' and 'attenuated' contacts that the purposeful availment requirement is meant to prevent from causing jurisdiction."  Id.

Defendants' counterarguments are unavailing.  Defendants cite three cases to demonstrate that they do not have sufficient minimum contacts with Tennessee.

First, Defendants cite Pease Construction, Inc. v. Crowder-Gulf Joint Venture, LLP, No. 10-2780, 2011 WL 2118662 (W.D. Tenn. May 27, 2011), for the proposition there is no personal jurisdiction when "the defendant's limited dealings with the Tennessee plaintiff occurred solely because the plaintiff happened to be located there."  (ECF No. 12-1 at PageID 63.)  However, Pease is unavailing. The court in Pease determined the defendant had not purposefully availed itself of Tennessee law because the contract at issue was "limited to [one project] and did not contemplate any future dealings between [the parties.]"  2011 WL 2118662, at *7.  There, "nothing suggest[ed] that they intended to create a business relationship lasting beyond the [one project]."  Id.  Here, however, that is not true; Defendants were "investigating RMW to determine whether Golden North should invest in or purchase RMW."  (ECF No. 12-1 at PageID 64.)  This "suggests that they intended to create a business relationship" going forward, whether Golden North decided to invest in or purchase RMW, or whether Golden North decided not to do so, and merely collect the bill it was owed.  See Pease, 2011 WL 2118662, at *7.  This is a "continuing relationship" which renders Defendants "subject to regulation and sanctions in

10

[Tennessee] for the consequences of their activities." Kerry Steel, Inc. v. Paragon Indus., Inc., 106 F.3d 147, 151 (6th Cir. 1997).

Next, Defendants cite Bulso v. O'Shea, 730 F. App'x 347 (6th Cir. 2018), for the proposition that there is no specific personal jurisdiction even when the defendants' contacts with a forum state include "purposefully engaging the services of [the forum state's] law firm, traveling to [the forum state] at least once, communicating with the [the forum state] plaintiff by phone and email, and serving summons on the plaintiff in [the forum state]." (ECF No. 12-1 at PageID 63 (citing Bulso, 730 F. App'x at 350).) Bulso, however, is unavailing. There, the court found no purposeful availment because the "defendants' contacts with Tennessee came from [the plaintiff's] law firm being located in Tennessee, not because the defendants sought to invoke the benefits and protections of Tennessee law." Bulso, 730 F. App'x at 350. Here, Defendants explicitly sought to invoke these benefits and protections. See id. Kraft traveled from Alaska to Tennessee to conduct due diligence in possibly investing in RMW, a Tennessee business. (ECF No. 12-1 at PageID 64.) Kraft communicated with Robert Watson as part of her and Golden North's investigation into RMW's finances. (ECF No. 1-1 at PageID 13.) This action did not occur just because Plaintiff happened to be in Tennessee; rather, this action occurred because "[Defendants] sought[] to further [their] business and create 'continuous and substantial' consequences there." Calphalon Corp., 228 F.3d at 723. Defendants' contacts were not "the type of 'random,' 'fortuitous,' and 'attenuated' contacts that the purposeful availment requirement is meant to prevent from causing jurisdiction." Id.

Finally, Defendants cite Bissell Homecare, Inc. v. PRC Industries, Inc., No. 1:13-CV-1182, 2014 WL 3756131 (W.D. Mich. July 31, 2014), for the proposition that an NDA is not enough to find purposeful availment to establish personal jurisdiction. (ECF No. 12-1 at PageID

11

64–65.)  It is correct that a NDA by itself is not enough to establish purposeful availment.  See Bissell, 2014 WL 3756131, at *13 (finding the NDA "not . . . significant in the analysis of purposeful availment" given its "fairly standard" nature and the fact that it was "merely a vehicle for the exchange of information necessary").  However, the Bissell court ultimately decided that there was no purposeful availment because "telephone and email contacts with any Bissell employees in Michigan resulted because Bissell's decision-makers were apparently located in Michigan, not because Defendant was furthering its business in Michigan."  Id.  That is not the case here.  Defendants' contact with Todd Watson specifically occurred in the context of conducting due diligence in a possible investment into RMW, a Tennessee company.  (ECF No. 1-1 at PageID 13.)  That constitutes "furthering [Defendants'] business," which results in purposeful availment for specific personal jurisdiction.  See Bissell, 2014 WL 3756131, at *13.

      *ii.  Claim arising from Defendants' contacts*

 "This [element] requires that [Defendants'] contacts be 'related to the operative facts of the controversy.'"  See Schmuckle, 854 F.3d at 903 (quoting Bird v. Parsons, 289 F.3d 865, 875 (6th Cir. 2002)).  "This is a lenient standard, requiring only that the cause of action have a substantial connection to the defendant's activity in the state."  Id. (cleaned up).

    For prong two of the Mohasco test, Plaintiff has satisfied its prima facie burden in showing his claim arises from Defendants' contacts with Tennessee.  Id.  Plaintiff argues that there is "a strong connection between Defendants' allegations, Kraft's visit to RMW and Al Watson's termination."  (ECF No. 17 at PageID 91.)  Plaintiff avers this strong connection is present because shortly after Kraft's text messages and her meeting with RMW in Tennessee, RMW terminated Plaintiff, without any independent audit.  (Id. at PageID 90–91.)  Here, the "operative facts of the controversy" are the circumstances of Plaintiff's termination and whether

12

Kraft's texts were defamatory, which "arise from [Defendants'] contacts with [Tennessee]"—
Kraft's texts to Robert Watson and Golden North's due diligence investigation into RMW.  See
Devault-Graves Agency, LLC v. Salinger, No. 2:15-CV-02178-STA, 2015 WL 6143513, at *5
(W.D. Tenn. Oct. 19, 2015) (citing Mohasco, 401 F.2d at 384).  Thus, there is a "substantial
connection" such that Plaintiff's claim arises from Defendants' contacts with Tennessee.  See
Schmuckle, 854 F.3d at 903.

 *iii. Reasonableness*

  For the third prong of the Mohasco test, the Court looks to see "that the defendant ha[s] a
sufficiently substantial connection to the forum such that the exercise of jurisdiction is not
unreasonable."  Schneider, 669 F.3d at 703.  "Where the first two criteria are met, an inference of
reasonableness arises and only the unusual case will not meet the substantial connection
criterion."  Id. (cleaned up).

  Plaintiff argues that exercise of specific personal jurisdiction over Defendants is
reasonable, as this is not the "rare situation where the plaintiff's interest and the state's interest in
adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the
burden of subjecting the defendant to litigation within the forum."  (ECF No. 17 at PageID 91
(cleaned up).)  Defendants contest this, arguing that "requiring them to litigate in Tennessee
would be unreasonable and unfair," as they were "simply investigating a business relationship,"
and "took no direct actions towards [Tennessee] such that they could reasonably foresee being
haled into court here."  (ECF No. 12 at PageID 65–66.)  Based on these facts and that "Plaintiff
now resides in another state," Defendants argue that "Tennessee has no interest in the parties'
dispute."  (Id. at PageID 66.)

Here, Plaintiff's argument must prevail.  Defendants have not met their high burden to show specific personal jurisdiction in Tennessee would be unreasonable.  See Susan McKnight, Inc. v. United Indus. Corp., 273 F. Supp. 3d 874, 888 (W.D. Tenn. 2017).  Defendants' argument that they were "simply investigating a business relationship" and "took no direct actions" towards Tennessee, (ECF No. 12 at PageID 65–66), are unavailing because conducting due diligence for the possible investment in or purchase of a Tennessee company, as well as flying to Tennessee and sending the allegedly defamatory texts into Tennessee, are direct actions towards Tennessee.  See Susan McKnight, 273 F. Supp. 3d at 888.  Thus, the exercise of specific personal jurisdiction over Defendants is reasonable and complies with due process.  See Schneider, 669 F.3d at 704.

### B.  Failure to State a Claim

Defendants contend that Plaintiff cannot support his defamation claim because the text messages are subject to common interest privilege, as both Defendants and RMW had an interest in RMW's financial well-being.  (ECF No. 12-1 at PageID 67.)   Defendants argue that "both [Defendants and Todd Watson] were interested in the possibility of Golden North becoming either an investor or purchaser of RMW. Additionally, both sides had an interest in resolving a dispute related to payments owed by RMW to Golden North."  (Id. at PageID 69 (internal citations omitted).)   In addition to this mutual interest, Defendants argue that "Kraft had a reasonable moral obligation to share her opinion on the matter."  (Id.)  If common interest privilege applies to Kraft's texts, Plaintiff must prove actual malice, which Defendants argue Plaintiff cannot do.  (Id. at PageID 67–68.)

Plaintiff disputes the application of common interest privilege to Kraft's texts.  (ECF No. 17 at PageID 92.)  He does so for three reasons: (1) the privilege is inapplicable as a matter of

law; (2) it is inappropriate to dismiss the case on basis of the privilege at this stage of litigation; (3) the facts as pled do not support an application of the privilege.  (Id.)

Moving forward, the Court considers two central questions: first, does common interest privilege apply to Kraft's texts?  And if it does, is it appropriate to dismiss the case at this stage?

     *i.*   *Common Interest Privilege*

Defendants are asking the Court to expand the breadth of common interest privilege to encompass communications between parties considering a merger and are in the initial stages of conducting due diligence.  (ECF No. 12 at PageID 67.)  The Court declines to do so.

     a.   <u>Tennessee Common Interest Privilege and the Court's Application of Tennessee Law</u>

"In Tennessee, the common interest privilege has been applied to 'communications between employees or agents of the same business or corporation.'"  <u>McGuffey v. Belmont Weekday Sch.</u>, No. M201901413COAR3CV, 2020 WL 2754896, at *15 (Tenn. Ct. App. May 27, 2020).  Tennessee courts have also expanded common interest privilege to encompass "a school's communications with the parents of its students," <u>id.</u>, as well as communications between a hospital and medical group.  <u>See</u> <u>Bernard v. Sumner Reg'l Health Sys., Inc.</u>, No. M2000-01478-COA-R3CV, 2002 WL 459006, at *5 (Tenn. Ct. App. Mar. 26, 2002).

Many common interest privilege cases in Tennessee deal with employer-employee relationships, which are a specific, close, contractual relationship.  <u>See</u> <u>Freeman v. Dayton Scale Co.</u>, 19 S.W.2d 255, 257 (Tenn. 1929) (employment based); <u>Southern Ice Co. v. Black</u>, 189 S.W. 861 (Tenn. 1916) (same); <u>Tate v. Baptist Memorial Hosp.</u>, 2000 WL 1051851, *2-3 (Tenn. Ct. App., July 28, 2000) (same); <u>Dickson v. Nissan Motor Mfg. Corp., USA</u>, 1988 WL 9805 (Tenn. Ct. App., Feb. 10, 1998) (same); <u>Evans v. Amcash Mrtg. Co., Inc.</u>, 1997 WL 431187 (Tenn. Ct. App., Aug. 1, 1997) (same); <u>Perry v. Fox</u>, 1994 WL 715740 (Tenn. Ct. App. Dec. 21, 1994)

(same); see also McGuffey, 2020 WL 2754896, at *15 ("In Tennessee, the common interest privilege has been applied to 'communications between employees or agents of the same business or corporation.'")

In deciding whether to expand common interest privilege to encompass a school's communications with the parents of its students, the McGuffey court stated that "the reasoning underlying the privilege would support its application to communications with the parents. Parents have an interest in staffing decisions regarding the persons taking care of their children. In fact, DHS regulations in effect at the time of [the teacher's] termination required child care agencies to communicate with parents regarding staff changes." 2020 WL 2754896, at *15.

The reasoning of the McGuffey court—as well as the reasoning behind common interest privilege in Tennessee law—does not support the application of common interest privilege here. On one hand, it is true that the parties had a business relationship: they signed an NDA, and they were both concerned with RMW's financial well-being in case Golden North decided to invest in or purchase RMW. (ECF No. 12 at PageID 56.) On the other hand, Golden North was in its initial stages of due diligence, and the NDA was a "boilerplate" document so that Golden North could audit RMW's finances. (Id. at PageID 64–65.) Further, while the parties may have an interest in the financial health of RMW, this does not rise to either the contractual interest present in employer-employee relationships, nor the parental or regulatory interest recognized by McGuffey. See McGuffey, 2020 WL 2754896, at *15.

      b.  <u>Outside Tennessee Cases</u>

Defendants cite a variety of cases in both state and federal courts outside of Tennessee which apply common interest privilege. [2]  None convince the Court to expand common interest privilege under Tennessee law beyond its current bounds.

Defendants cite <u>MacDonald v. Aspect Development, Inc.</u>, No. H025237, 2004 WL 625755, at *8 (Cal. Ct. App. Mar. 30, 2004), <u>as modified</u> (Apr. 6, 2004), to show that another court has "applied the common interest privilege in situations like the one before this Court where two separate corporations shared a mutual interest in the subject matter of their communications."  (ECF No. 12-1 at PageID 69.)  However, <u>MacDonald</u> is not persuasive for two reasons. One, <u>MacDonald</u> involves a statutory common interest privilege, 2004 WL 625755, at *8, while here, Defendants are alleging a common law privilege.  (ECF No. 12-1 at PageID 67.)  Two, the court in <u>MacDonald</u> concluded that common interest privilege applied because the parties had both a "contractual relationship (the pending merger) and a shared interest in the competence of their sales forces."  2004 WL 625755, at *8.  Here, however, the parties have not demonstrated a contractual relationship on the level of a merger agreement, besides an NDA, which Defendants stated was a "'fairly standard agreement and merely a vehicle for the exchange of information necessary to negotiate.'"  (ECF No. 12-1 at PageID 65 (quoting <u>Bissell</u>, 2014 WL 3756131, at *13).)

---

[2] Defendants also cite the language in the Restatement (Second) of Torts § 596 for a "broad approach to the applicability of the common interest privilege."  (ECF No. 19 at PageID 112 (citing Restatement (Second) of Torts § 596).)  However, Restatement language should only be used "when there is no controlling state law on point when the state has indicated . . . that it considers the Restatements to be persuasive authority."  <u>Beau Townsend Ford Lincoln, Inc. v. Don Hinds Ford, Inc.</u>, 759 F. App'x 348, 353 (6th Cir. 2018) (quoting <u>Garrison v. Jervis B. Webb Co.</u>, 583 F.2d 258, 262 n.6 (6th Cir. 1978)); <u>see also</u> <u>Innerimages, Inc. v. Newman</u>, 579 S.W.3d 29, 46 (Tenn. Ct. App. 2019) ("In the absence of a controlling statute or guidance from the Supreme Court, this Court has the authority to adopt provisions of a Restatement in order to further the development of the common law in this state.).

Defendants then cite Prudential Retirement Insurance & Annuity Co. v. State Street Bank & Trust Co., No. 07 CIV. 8488 PAC, 2012 WL 5868301, at *6 (S.D.N.Y. Nov. 19, 2012), for the proposition that common interest privilege can "arise out of an investment company's business relationship with its customers due to the parties' common interest in the investments and services company's management of them.'" (ECF No. 12-1 at PageID 70 (quoting Prudential, 2012 WL 5868301, at *6) (cleaned up).) However, Prudential is not persuasive either. The cited portion of Prudential relates to a previous summary judgment decision in the same controversy, In re State Street Bank & Trust Co. Fixed Income Funds Investment Litigation, 772 F. Supp. 2d 519, 524 (S.D.N.Y. 2011) ("Prudential SJ"). In Prudential SJ, the court concluded that common interest privilege "arose from the plaintiff's business relationship with the plans that gave rise to a common interest." Id. at 560 (cleaned up). However, the business relationship in Prudential SJ (and thus, Prudential) differs from the business relationship here. In Prudential, the business relationship lasted for many years, where the defendant would provide monthly reports to the plaintiff, and the parties discuss "strategy [and] leverage." Id. at 524, 526, 536. Here, however, the parties had a significantly less involved relationship, as they had only begun to investigate the possibility of investment or acquisition. (ECF No. 1-1 at PageID 11–13.)

However, Defendants do cite an analogous case in their Reply: Lever v. Community First Bancshares, Inc., 989 P.2d 634 (Wyo. 1999). In Lever, the Wyoming Supreme Court concluded common interest privilege applied to a communication of a "routine business transaction in which both parties had a pecuniary interest." Id. at 638. Specifically, the "routine business transaction" was "about a prospective loan to finance [a] business venture." Id. at 639. This is similar to the prospective nature of the business transaction here, where Defendants were

conducting due diligence as to whether to invest in or purchase RMW.  (See ECF No. 12-1 at PageID 69.)

The Lever court further reasoned that there was a common interest, and thus a qualified privilege, because "the Bank had an interest in any money it is being asked to loan, as did the recipient of that loan."  Lever, 989 P.2d at 639 (cleaned up).  Further, "the Bank had a legitimate interest in assuring repayment of that loan and a concomitant interest in the purposes for which the recipient planned to utilize the loan. Similarly, the prospective borrower had an obvious interest in the loan—to further the business venture."  Id. (cleaned up).  Similarly, here, Defendants and Todd Watson were "interested in the possibility of Golden North becoming either an investor or purchaser of RMW" and "had an interest in resolving a dispute related to payments owed by RMW to Golden North."  (ECF No. 12-1 at PageID 69.)

While the Court finds the reasoning of the Lever court helpful, it still declines to expand Tennessee common interest privilege law. "Federal courts must be cautious when making pronouncements about state law."  In re Darvocet, Darvon, & Propoxyphene Prod. Liab. Litig., 756 F.3d 917, 937 (6th Cir. 2014) (cleaned up).  Indeed, "when given a choice between an interpretation of state law which reasonably restricts liability, and one which greatly expands liability, the Court should choose the narrower and more reasonable path."  Combs v. Int'l Ins. Co., 354 F.3d 568, 577 (6th Cir. 2004) (cleaned up).  Here, the Court has a choice as whether to expand Tennessee common interest privilege law beyond its precedential bounds. The Court is wary to expand the bounds of the privilege and declines to do so.  See id.  Thus, Defendants' 12(b)(6) motion is denied.

c.  Defendants' Morality Argument

Defendants also argue that "[a]t minimum, Defendant Kraft had a reasonable moral obligation to share her opinion on the matter." (ECF No. 12 at PageID 69.) This seems to draw inspiration from the Tennessee Supreme Court's language in Southern Ice:

> Qualified privilege extends to all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty; and the privilege embraces cases where the duty is not a legal one, but where it is of a moral or social character of imperfect obligation.

136 Tenn. 391, 189 S.W. 861, 863 (1916) (emphasis added).

The Court finds Defendants' morality argument unavailing for the same reasons as above; namely, finding a qualified privilege on a solely moral duty does not have support in Tennessee case law. See supra Section III.B.i.a. Indeed, Defendants cite no cases where a court has held common interest privilege to apply based solely on a moral duty.

ii.  Appropriateness of Dismissal

Even if the Court found common interest privilege to apply, dismissal would be premature, and should thus be denied. Plaintiff makes the argument that common interest privilege should not be used to dismiss its claim of defamation at the motion to dismiss stage of litigation, (ECF No. 17 at PageID 96), and cites American Addiction Centers, Inc. v. National Association of Addiction Treatment Providers for this proposition. See 515 F. Supp. 3d 820, 834 (M.D. Tenn. 2021) (finding it "generally inappropriate" to grant a 12(b)(6) motion based on a defendant's assertion of qualified privilege). Indeed, even if the texts are privileged, "[Kraft's] statements could also be stripped of their privileged status if discovery were to reveal that [Kraft] knew or recklessly disregarded the complete absence of any factual basis for [her] comments

about [Plaintiff]." <u>VECC, Inc. v. Bank of Nova Scotia</u>, 296 F. Supp. 2d 617, 624 (D.V.I. 2003).

Thus, the Court finds it inappropriate to dismiss the action at this stage in the litigation.[3]

## IV.   CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss is **DENIED**.  The Court

finds: (1) that specific personal jurisdiction over Defendants is proper; and (2) Plaintiff has stated

a claim upon which relief can be granted.

**SO ORDERED**, this 3rd day of December, 2024.

/s/ Jon P. McCalla
JON P. MCCALLA
UNITED STATES DISTRICT COURT JUDGE

---

[3] Because Defendants' arguments to dismiss the second and third causes of action are based in the argument to dismiss the first cause of action, all claims survive the Motion to Dismiss.  (<u>See</u> ECF No. 12 at PageID 71–72.)